UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Case No. 20-CV-_____** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **STEVEN J. SHEINFELD,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission (the "SEC") files this

Complaint against defendant Steven J. Sheinfeld ("Sheinfeld") and alleges as

follows:

**SUMMARY**

1.      Sheinfeld illegally traded on inside information about his employer

Rite Aid Corp. ("Rite Aid") by selling nearly $1 million in Rite Aid securities in

advance of disappointing news that caused the price of Rite Aid securities to drop

when revealed to the market.

2.      In January 2017, Sheinfeld, who had worked at Rite Aid for over

twenty years, was asked to lead a sensitive project that involved integrating

company policies related to implementing a publicly-announced merger (the

"Planned Merger") of Rite Aid with Walgreens Boots Alliance, Inc.

("Walgreens").

3.      While working on the project, Sheinfeld learned highly-confidential

information that the Planned Merger was not expected to close by the scheduled

deadline of January 27, 2017.  Failure to meet this closing deadline meant that Rite

Aid and Walgreens had not obtained regulatory approval for the Planned Merger,

and that the deal terms would need to be renegotiated.  Sheinfeld knew, or

recklessly avoided knowing, that when the market learned this information, Rite

Aid's stock price would fall.

4.      Sheinfeld also knew that he was prohibited from trading on material

nonpublic information about Rite Aid or the Planned Merger.  Indeed, Sheinfeld

oversaw Rite Aid's compliance with its Code of Business Ethics & Conduct (the

"Code of Conduct"), which explicitly prohibited insider trading.

5.      Nonetheless, in January 2017, when Sheinfeld learned that the

Planned Merger was unlikely to close by the expected date, he liquidated nearly all

of his Rite Aid holdings, thereby avoiding over $140,000 in losses.  Sheinfeld also

accessed two different family members' brokerage accounts and sold off their Rite

Aid holdings, avoiding over $15,000 in losses on behalf of his family members.

6.      By engaging in the conduct described in this Complaint, Sheinfeld

violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 21(d),

21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and

78aa].

8.      Venue is proper in this District pursuant to Section 27(a) of the

Exchange Act [15 U.S.C. § 78aa].  Among other things, certain of the acts,

practices, and courses of business constituting the violations of the federal

securities laws alleged herein occurred within the Middle District of Pennsylvania.

Sheinfeld worked for, and improperly traded in the securities of, Rite Aid, a

company that is headquartered in the Middle District of Pennsylvania.

## DEFENDANT

9.      **Sheinfeld**, age 67, lives in Cape Coral, Florida.  From 1994 until

April 2017, Sheinfeld worked at Rite Aid at the company headquarters in Camp

Hill, Pennsylvania.  During the relevant period, Sheinfeld maintained a residence

in Mechanicsburg, Pennsylvania.

10.     During the relevant time period, Sheinfeld was Vice President of

Internal Assurance Services, a position that was within Rite Aid's Internal

Audit/Compliance department.

11.     As Vice President of Internal Assurance Services, Sheinfeld reported

to Rite Aid's Chief Compliance Officer.

12.     During the relevant time period, Sheinfeld also served as the Chair of

Rite Aid's Policy Oversight Committee, which was a committee comprised of

personnel from various Rite Aid departments that oversaw all Rite Aid policies,

and Sheinfeld's responsibilities included overseeing and implementing a range of

employee policies, including the Code of Conduct.

13.     During the relevant time period, Sheinfeld was licensed as a Certified

Public Accountant ("CPA") in the state of New York.  Sheinfeld's CPA license

lapsed without explanation in August 2017.

## RELEVANT ENTITIES

14.     **Rite Aid** is a Delaware corporation headquartered in Camp Hill,

Pennsylvania, and is a retail pharmacy chain.  At all relevant times, Rite Aid's

stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act

and traded on the New York Stock Exchange under the symbol "RAD."

15.     **Walgreens** is a Delaware corporation headquartered in Deerfield,

Illinois, and is a global holding company that owns the Walgreens, Duane Reade,

and Boots retail pharmacy chains.  At all relevant times, Walgreen's stock was

registered with the SEC pursuant to Section 12(b) of the Exchange Act and traded

on NASDAQ under the symbol "WBA."

## TERMS USED IN THIS COMPLAINT

16.    A "call option" is a contract that entitles the holder to purchase a

security under specified terms.  The holder of a call option has the right, but not the

obligation, to buy the specified security at a set price (the "strike price") on or

before the expiration date for that option.

17.    One type of call option is an "employee stock option."  Certain

companies award employees employee stock options, which give the employees

the right to buy the company's stock at a specified price (the "grant price," a form

of strike price) for a certain period of time.

18.    An "out-of-the-money" call option is a call option with a strike or

grant price that is higher than the market price of the underlying asset.

19.    A "limit order" is an order to buy or sell a stock at a specific price or

better.  A sell limit order can only be executed at the limit price or higher.  A limit

order is not guaranteed to execute.

## FACTUAL ALLEGATIONS

### A. Sheinfeld Knew That Rite Aid Expressly Prohibited Insider Trading

20.     At all relevant times, Rite Aid had in place the Code of Conduct, which applied to all Rite Aid employees and was reviewed and agreed to by each employee upon hiring.

21.     Sheinfeld, as a Rite Aid employee, was covered by the Code of Conduct.

22.     Additionally, in his capacity as the Chair of Rite Aid's Policy Oversight Committee, Sheinfeld oversaw compliance with Rite Aid's Code of Conduct, including overseeing the design and implementation of required annual trainings for employees.

23.     During the relevant period, the Code of Conduct stated that employees may learn confidential information about Rite Aid in the course of their work for Rite Aid.  The Code of Conduct prohibited employees who possess or have access to confidential information about Rite Aid from using the information for their own benefit or for the benefit of persons outside the company.

24.     The Code of Conduct contained a provision that expressly prohibited insider trading (the "Insider Trading Provision").

25.     The Insider Trading Provision provided that all employees who possess material nonpublic information are prohibited from buying or selling Rite Aid securities.

26.     The Insider Trading Provision also noted that information is considered material if "there is a substantial likelihood that a reasonable investor would find the information important in determining whether to trade in a security," or if "the information, if made public, would likely affect the market price of a company's securities."

27.     As an employee of Rite Aid, Sheinfeld had reviewed and agreed to abide by the complete Code of Conduct, including the Insider Trading Provision.

## B. Sheinfeld Learned Material Nonpublic Information Through His Work at Rite Aid

### 1.  The Planned Merger

28.     On October 27, 2015, Rite Aid and Walgreens announced publicly that they had entered into a definitive agreement (the "Merger Agreement") under which Walgreens would acquire all outstanding shares of Rite Aid for $9.00 per share in cash.  The purchase price represented a 48% premium over the closing price per share of Rite Aid on the previous day.  In the press release announcing the agreement, Rite Aid and Walgreens stated that the Planned Merger was expected to close in the second half of 2016.

29.     The Merger Agreement had an end date of October 27, 2016.  Under

the terms of the Merger Agreement, either Rite Aid or Walgreens had the right to

extend the end date from October 27, 2016 to January 27, 2017.

30.     The Planned Merger was subject to approval by the Federal Trade

Commission ("FTC").

31.     By October 2016, the FTC had not yet approved the Planned Merger.

On October 20, 2016, Rite Aid and Walgreens announced that they had mutually

agreed to extend the end date of the Merger Agreement to January 27, 2017,

stating that they expected the Planned Merger would close in early 2017.

32.     On December 20, 2016, Rite Aid and Walgreens announced that they

had entered into an agreement with another pharmacy chain to sell 865 Rite Aid

stores to the pharmacy chain.  Rite Aid and Walgreens stated that they entered into

the agreement with the pharmacy chain to respond to concerns identified by the

FTC in its review of the Planned Merger.

33.     The December 20, 2016 announcement stated that Walgreens was

actively engaged in discussions with the FTC regarding the Planned Merger and

was working toward a close of the Planned Merger in early 2017.

34.     As the January 27, 2017 Merger Agreement end date approached,

information concerning the Planned Merger and the FTC's approval was highly

material to the market.

35.     Based on the terms of the Merger Agreement, if the FTC did not approve the Planned Merger by January 27, 2017, Rite Aid and Walgreens would need to agree to amend the Merger Agreement in order to extend the end date.

36.     Rite Aid, Walgreens, and investors understood that should the Merger Agreement need to be amended in order to satisfy FTC concerns, Rite Aid and Walgreens would likely be required to divest additional stores and therefore the price per share paid by Walgreens would likely be reduced.

37.     In early January 2017, senior executives at Rite Aid learned—contrary to the generally positive public speculation—that the FTC remained concerned about the antitrust implications of the merger of Rite Aid and Walgreens.

38.     On or around January 6, 2017, Rite Aid's board of directors held a meeting which was attended by various high-level executives at Rite Aid.  At the January 6, 2017 board meeting, Rite Aid's outside counsel stated the FTC would likely not approve the Planned Merger by the January 27 end date.

39.     Meanwhile, overnight on January 10, 2017, the New York Post published a detailed article, citing sources close to the case and reporting that the FTC *was* expected to approve the Planned Merger prior to the presidential inauguration on January 20, 2017.  On January 11, 2017, when trading resumed, Rite Aid's stock price reached a high of $8.69 —a 4.4 percent increase over the prior day's closing price.

### 2. Sheinfeld had Confidential Information About the Planned Merger

40.    In mid-January, 2017, through his position at Rite Aid, relationships with senior Rite Aid executives, and work helping to prepare for the Planned Merger, Sheinfeld had access to, and learned, confidential information that the merger was unlikely to obtain the FTC approval needed for the Planned Merger to close in time for the January 27 end date.

41.    After the Planned Merger was announced in late 2015, Rite Aid and Walgreens formed an Integration Management Office ("IMO"), staffed by teams of employees at each company who worked to prepare to integrate the two companies should the Planned Merger be approved.

42.    Though Sheinfeld was not a member of the IMO, starting in early 2016, he was asked to assist the IMO with certain matters relating to compliance or employee policies.

43.    Rite Aid treated information about the Planned Merger as highly confidential, and all IMO members were told at the outset that everything they would be working on was confidential, should not be shared with anyone, and was only to be used to facilitate implementing the Planned Merger.

44.    When members of the IMO turned to other Rite Aid employees for assistance with IMO tasks, these employees were also provided with the same warning regarding the highly confidential nature of the work.

45.     Sheinfeld was warned regarding the confidentiality of the IMO's work in or about March 2016, when he began providing assistance to the IMO.

46.     Particularly as the end date in January 2017 approached, among other tasks, the IMO worked to implement changes that would be necessary for "Day One" of the newly merged company.

47.     On January 11, 2017, Sheinfeld was tasked with assisting the IMO with evaluating Walgreens' "Day One" policies—Walgreens' corporate policies that would immediately apply to all Rite Aid employees when the Planned Merger closed (the "Day One Policy Project").

48.     On January 13, 2017, Sheinfeld complained to a colleague about his role on the Day One Policy Project:  "I now have over 150 pages of policies (each policy is incredibly long) that have to be read and analyzed and it has to be done pronto.  These policies all get sent to the many members of the Policy Oversight Committee for their immediate review as if they have nothing else to do."

49.     Later that day, Sheinfeld sent an email to the members of the Policy Oversight Committee attaching Walgreens' policies for review, emphasizing the following:

> **We must have your feedback no later than Friday, January 20th, so that the additional efforts required to communicate them (or in some cases, to develop CBTs to create electronic acknowledgements) can be completed in time for Day One.  Send your responses directly to me and I will pass them on as appropriate**.

11

50.    From January 13-16, 2017, Sheinfeld continued to work on the Day One Policy Project, including after hours and over the weekend.

51.    On the morning of Tuesday, January 17, 2017, Sheinfeld received an email from a Rite Aid executive who reported directly to Rite Aid's general counsel and who was also a member of the Policy Oversight Committee ("Executive 1").  Executive 1 informed Sheinfeld that he had communicated with the high-level Rite Aid executive who was leading Rite Aid's merger efforts, and that there was "no urgency because we likely will not make the 1/27 date.  We should continue working on [the Day One Policy Project] but please do not feel this is urgent."

52.    Sheinfeld responded to Executive 1's email explaining that it had been Walgreen's team that had been rushing him on the Day One Policy Project. Executive 1 responded to Sheinfeld that he would talk to Walgreens.

53.    At approximately 4:30 pm on Tuesday, January 17, 2017, after the close of trading on the New York Stock Exchange, Executive 1 forwarded to Sheinfeld an email that Executive 1 sent to an individual at Walgreens.  The email read, "I understand you have given Steve Sheinfeld a deadline of this Friday with respect to policies for Day 1 prep.  I think we can relax this deadline some since it is doubtful closing will occur by 1/27.  Thanks!"

## C. Sheinfeld Traded Rite Aid Securities Based on Material Nonpublic Information

54.     On January 17, 2017, when Sheinfeld received the emails from Executive 1 stating that the Planned Merger was unlikely to meet the January 27, 2017 closing date, Sheinfeld owned 124,550 vested Rite Aid employee stock options.  On January 18, 2017, Sheinfeld liquidated nearly all of his Rite Aid holdings based on the material nonpublic information he had learned about the Planned Merger.  On January 19, 2017, Sheinfeld accessed two of his family members' brokerage accounts and sold their Rite Aid stock based on material nonpublic information about the Pending Merger.

55.     On January 18, 2017, the opening price for Rite Aid stock was $8.65 per share.  That morning, at approximately 9:31 a.m., Sheinfeld logged in to the brokerage account where he held his Rite Aid options.

56.     About six minutes later, at approximately 9:37 a.m., Sheinfeld called the customer support number for his brokerage account.

57.     During this January 18, 2017 recorded call, Sheinfeld stated that he was looking to exercise all of his Rite Aid options—amounting to 124,550 Rite Aid shares—and sell those shares at a limit price of $8.60 per share (approximately four cents below the current market price at the time).  The broker told Sheinfeld that 1,400 of the options were "out of the money", but that he could exercise the rest of the Rite Aid options.

13

58.     During the January 18, 2017 call, the broker told Sheinfeld that the sale of 123,150 shares of Rite Aid would constitute about 50% of the trading volume of Rite Aid at that time, and an order of that size could put negative pressure on the stock price and result in a lower price per share.  The broker explained that the trading desk would "work the trade," to try to avoid this negative effect.  The broker then asked whether Sheinfeld wanted the trading desk to work the trade to ensure the best price, which could take longer to accomplish, or whether Sheinfeld wanted to ensure the trade was worked in the best way to complete it (regardless of price).  Sheinfeld chose best way to complete, in order to sell the shares quickly.

59.     On January 18, 2017, between approximately 9:46 a.m. and 11:45 a.m., the trading desk executed the order, selling all 123,150 Rite Aid shares from the exercisable options at prices ranging from $8.62 to $8.65.

60.     By exercising and selling 123,150 Rite Aid employee stock options, Sheinfeld netted approximately $872,275 after paying $185,062 to cover the grant prices of the stock options (which ranged from $1.07 to $7.08 per share).

61.     On January 19, 2017, at approximately 3:28 p.m., Sheinfeld logged in to the brokerage account of a family member ("Family Member 1").  Family Member 1 had previously given Sheinfeld access to her brokerage account and allowed him to place trades on her behalf.

62.     After logging in to Family Member 1's account, Sheinfeld placed a

limit order to sell all 6,500 shares of Rite Aid in the account at a limit price of

$8.59 per share.  The order was fully executed almost immediately, and 6,500 Rite

Aid shares were sold from Family Member 1's account at prices ranging from

$8.59 to $8.60 per share, for a total of $55,841.

63.     The 6,500 shares of Rite Aid that Sheinfeld sold from Family Member

1's account were all of Family Member 1's Rite Aid holdings.

64.     Just a few minutes later, at approximately 3:35 p.m. on January 19,

2017, Sheinfeld logged in the brokerage account of another family member

("Family Member 2").  Family Member 2 had previously given Sheinfeld access to

her brokerage account and allowed him to place trades on her behalf.

65.     After logging in to Family Member 2's account, Sheinfeld placed an

order to sell all 7,200 shares of Rite Aid in the account at a limit price of $8.59 per

share.  The order was fully executed almost immediately, and 7,200 Rite Aid

shares were sold from Family Member 2's account at $8.59 per share, for a total of

$61,851.

66.     The 7,200 shares of Rite Aid that Sheinfeld sold from Family Member

2's account were all of Family Member 2's Rite Aid holdings.

**D. Rite Aid's Share Price Fell as the Market Learned That the Planned Merger Would Not Close by January 27, 2017**

67.    The next day, January 20, 2017, at approximately 10:40 am, Bloomberg published an article reporting that FTC officials were concerned that Walgreens' and Rite Aid's current efforts to preserve competition were not sufficient, and that the FTC likely would not be approving the Planned Merger by the January 27, 2017 end date.

68.    After the Bloomberg article became public, Rite Aid's stock price fell, closing on January 20, 2017 at $7.46 per share—approximately 13% lower than the prior day's closing price.

69.    On January 30, 2017, Rite Aid and Walgreens officially announced an amended merger agreement, extending the end date to July 31, 2017 and lowering the price that Walgreens would pay per share of Rite Aid from $9.00 to $6.50 to $7.00.

70.    By liquidating the vast majority of his position in Rite Aid in advance of the public disclosure of the failure to obtain FTC approval for the Planned Merger by the January 27, 2017 deadline, Sheinfeld avoided losses of at least $140,000.  By liquidating his family members' Rite Aid positions in advance of the public disclosure of the information about the Planned Merger, Sheinfeld avoided losses for Family Member 1 and Family Member 2 of at least $7,000 and $8,000, respectively.

### E.  Sheinfeld Violated the Federal Securities Laws

71.    As the Vice President of Internal Assurance Services at Rite Aid,

Sheinfeld had a duty to Rite Aid and its shareholders not to trade Rite Aid

securities, either in his own account or in the accounts of his family members, on

the basis of material nonpublic information.

72.    On January 17 and 18, 2017, information about the Planned Merger,

including information about FTC approval of the Planned Merger and the likely

timing of the Planned Merger, was confidential.  Rite Aid established policies and

procedures designed to protect such information and to prohibit its employees from

trading on such information.

73.    A reasonable investor would have viewed information relating to the

Planned Merger, including information about FTC approval of the Planned Merger

and the likely timing of the Planned Merger, as being important to his or her

investment decision and/or significantly altering the total mix of information

available to the public.

74.    Sheinfeld knew, or was reckless in not knowing, that he had a duty

not to trade Rite Aid securities on the basis of confidential information about the

Planned Merger, including information about FTC approval of the Planned Merger

and the likely timing of the Planned Merger.

75.     In breach of his duty to Rite Aid and its shareholders, Sheinfeld traded Rite Aid securities, in his own account and in the accounts of Family Member 1 and Family Member 2, on the basis of material nonpublic information relating to the Planned Merger.

## CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

76.     The SEC re-alleges and incorporates by reference the allegations in paragraphs 1 – 75, as if they were fully set forth herein.

77.     By engaging in the conduct described above, Sheinfeld directly or indirectly, in connection with the purchase or sale of securities, and by use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, has, knowingly or recklessly:

(a) employed a device, scheme, or artifice to defraud;

(b) made an untrue statement of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

(c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

78.     By reason of the foregoing, Sheinfeld has violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Sheinfeld from directly or indirectly engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Sheinfeld to pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

### III.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws.

Respectfully submitted,

Date:   September 17, 2020

s/ Julia C. Green

Julia C. Green NY 4257481
Jennifer C. Barry
Scott A. Thompson
Megan Ryan
U.S. SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(267) 602-2133 (Green)
(215) 597-2740 (fax)
greenju@sec.gov