**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | : | |
| **COMMISSION,** | : | |
| **Plaintiff** | : | **No. 1:20-cv-01692** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **STEVEN J. SHEINFELD,** | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Before the Court is Defendant Steven J. Sheinfeld ("Defendant" or "Sheinfeld")'s motion to dismiss Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC")'s complaint against him for failure to state a claim for which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 12.)  For the reasons that follow, the Court will deny Defendant's motion.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiff initiated the above-captioned action on September 17, 2020 by filing a complaint in this Court asserting that Defendant violated federal securities laws—specifically, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, which prohibit insider trading.  (Doc. No. 1.) Defendant filed the instant motion to dismiss on November 16, 2020, followed by a brief in support on November 17, 2020.  (Doc. Nos. 12, 13.)  After being granted an extension of time to file a brief in opposition (Doc. No. 15), the SEC filed its opposition on December 16, 2020 (Doc. No. 17.)  Defendant filed his reply on December 30, 2020.  (Doc. No. 18.)  Having been fully briefed, the motion is ripe for disposition.

B.      **Factual Background**[1]

For purposes of this complaint, the relevant entities are as follows: (1) Rite Aid is a Delaware corporation and retail pharmacy chain headquartered in Camp Hill, Pennsylvania (Doc. No. 1 ¶ 14); and (2) Walgreens is a Delaware corporation headquartered in Deerfield, Illinois, and is a global holding company that owns the retail pharmacy chains of Walgreens, Duane Reade, and Boots (id. ¶ 15).  At all times relevant to the complaint, Rite Aid's stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the symbol "RAD."  (Id. ¶ 14.)  Similarly, at all relevant times, Walgreens' stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ under the symbol "WBA."  (Id. ¶ 15.)

Sheinfeld, age sixty-seven (67), and current resident of Cape Coral, Florida, is the former Vice President of Internal Assurance Services at Rite Aid within Rite Aid's Internal Audit/Compliance department, in which role he reported to Rite Aid's Chief Compliance Officer.  (Id. ¶¶ 9-11.)  During the relevant period, Shienfeld was licensed as a Certified Public Accountant ("CPA") in the state of New York and also served as the Chair of Rite Aid's Policy Oversight Committee, in which role his responsibilities included overseeing and implementing employee policies, including overseeing compliance with Rite Aid's Code of Conduct and required annual trainings.  (Id. ¶¶ 12-13, 22.)  As a Rite Aid employee, Sheinfeld was covered by the Code of Conduct which prohibited employees in possession of or with access to confidential information about Rite Aid from using that information for their own benefit or the benefit of persons outside the company.  (Id. ¶ 23.)  To this end, the Code of Conduct expressly included a

---

[1] The following factual background is taken from the allegations of Plaintiff's complaint.  (Doc. No. 1.)

prohibition on insider trading that provided "that all employees who possess material nonpublic information are prohibited from buying or selling Rite Aid securities."  (Id. ¶¶ 24-25.)  This provision "noted that information is considered material if 'there is a substantial likelihood that a reasonable investor would find the information important in determining whether to trade in a security,' or if 'the information, if made public, would likely affect the market price of a company's securities.'"  (Id. ¶ 26.)

On October 27, 2015, Rite Aid and Walgreens announced that they had entered into an agreement (the "Merger Agreement") under which Walgreens would acquire all outstanding shares of Rite Aid for $9.00 per share in cash.  (Id. ¶ 28.)  The merger was initially expected to close "in the second half of 2016," and the Merger Agreement had an end date of October 27, 2016; however, by its terms, either Rite Aid or Walgreens could extend the end date from October 27, 2016 to January 27, 2017.  (Id. ¶¶ 28-29.)  The merger was subject to approval by the Federal Trade Commission ("FTC").  (Id. ¶ 30.)  When the FTC had not approved the merger by October 2016, Rite Aid and Walgreens announced that they had agreed to exercise the option to extend the end date of the Merger Agreement to January 27, 2017.  (Id. ¶ 31.)  On December 20, 2016, Rite Aid and Walgreens announced that they had entered into an agreement with another pharmacy chain to sell eight hundred sixty five (865) Rite Aid stores in order "to respond to concerns identified by the FTC in its review of the Planned Merger."  (Id. ¶ 32.)  Under the terms of the Merger Agreement, if the FTC failed to approve the merger by January 27, 2017, Rite Aid and Walgreens would need to amend the Merger Agreement in order to extend the end date.  (Id. ¶ 35.)

Plaintiff alleges that "[a]s the January 27, 2017 Merger Agreement end date approached, information concerning the Planned Merger and the FTC's approval was highly material to the

market" and that "Rite Aid, Walgreens, and investors understood that should the Merger Agreement need to be amended in order to satisfy FTC concerns, Rite Aid and Walgreens would likely be required to divest additional stores and therefore the price per share paid by Walgreens would likely be reduced."  (Id. ¶¶ 34, 36.)  Plaintiff asserts that in early January 2017, "senior executives learned—contrary to the generally positive public speculation—that the FTC remained concerned about the antitrust implications of the merger" and that, on or about January 6, 2017, Rite Aid's board of directors held a meeting with various high-level executives at Rite Aid, during which "Rite Aid's outside counsel stated the FTC would likely not approve the Planned Merger by the January 27 end date."  (Id. ¶¶ 37-38.)  However, on January 10, 2017, the New York Post published a "detailed article, citing sources close to the case" that reported the FTC was expected to approve the merger "prior to the presidential inauguration on January 20, 2017."  (Id. ¶ 39.)  Plaintiff notes that when trading resumed the morning of January 11, 2017, "Rite Aid's stock price reached a high of $8.69—a 4.4 percent increase over the prior day's closing price."  (Id.)

Plaintiff alleges that "[i]n mid-January 2017, through his position at Rite Aid, relationships with senior Rite Aid executives, and work helping to prepare for the Planned Merger, Sheinfeld had access to, and learned, confidential information that the merger was unlikely to obtain the FTC approval needed for the Planned Merger to close in time for the January 27 end date."  (Id. ¶ 40.)  Specifically, Plaintiff alleges that, following the announcement of the merger in 2015, Rite Aid and Walgreens formed "an Integration Management Office ("IMO"), staffed by teams of employees at each company who worked to prepare to integrate the two companies."  (Id. ¶ 41.)  Plaintiff asserts that "starting in early 2016, [Sheinfeld] was asked to assist the IMO with certain matters relating to compliance or employee policies."  (Id. ¶ 42.)

To this end, Plaintiff asserts that as the end date in January 2017 approached, the IMO worked to implement changes that would be necessary for "Day One" of the merged company, and that Sheinfeld was "tasked with assisting the IMO with evaluating Walgreens' 'Day One' policies—Walgreens' corporate policies that would immediately apply to all Rite Aid employees when the Planned Merger closed."  (Id. ¶¶ 46-47.)

With respect to Sheinfeld's work on this project, Plaintiff alleges that, on January 13, 2017, Sheinfeld "complained to a colleague about his role on the Day One Policy Project" because of the limited time remaining to complete his review.  (Id. ¶ 48.)  Similarly, on the same day, Sheinfeld sent an email to the members of the "Policy Oversight Committee" emphasizing the need to receive feedback "no later than Friday, January 20th, so that the additional efforts required to communicate [feedback] . . . can be completed in time for Day One."  (Id. ¶ 49.) Plaintiff alleges that from January 13, 2017 through January 16, 2017, "Sheinfeld continued to work on the Day One Policy Project, including after hours and over the weekend."  (Id. ¶ 50.) However:

> [o]n the morning of Tuesday, January 17, 2017, Sheinfeld received an email from a Rite Aid executive who reported directly to Rite Aid's general counsel and who was also a member of the Policy Oversight Committee ("Executive 1"). Executive 1 informed Sheinfeld that he had communicated with the high-level Rite Aid executive who was leading Rite Aid's merger efforts, and that there was 'no urgency because we likely will not make the 1/27 date.  We should continue working on [the Day One Policy Project] but please do not feel this is urgent.'

(Id. ¶ 51.)  When Sheinfeld replied to the email, indicating that the Walgreens team had been rushing him, Executive 1 allegedly responded that "he would talk to Walgreens."  (Id. ¶ 52.)

Accordingly, Plaintiff alleges that:

> [a]t approximately 4:30 pm on Tuesday, January 17, 2017, after the close of trading on the New York Stock Exchange, Executive 1 forwarded to Sheinfeld an email that Executive 1 sent to an individual at Walgreens.  The email read, 'I understand you have given Steve Sheinfeld a deadline of this Friday with respect

to policies for Day 1 prep.  I think we can relax this deadline some since it is doubtful closing will occur by 1/27.  Thanks!'

(Id. ¶ 53.)

Plaintiff alleges that, on January 17, 2017, when Sheinfeld received the aforementioned emails stating that the merger was unlikely to meet the January 27, 2017 closing date, Sheinfeld owned 124, 550 vested Rite Aid employee stock options.  (Id. ¶ 54.)  Plaintiff asserts that, on January 18, 2017, "Sheinfeld liquidated nearly all of his Rite Aid holdings based on the material nonpublic information he had learned about the Planned Merger" and that, on January 19, 2017, "Sheinfeld accessed two of his family members' brokerage accounts and sold their Rite Aid stock based on material nonpublic information about the Pending Merger."  (Id.)  More specifically, Plaintiff alleges that at approximately 9:31 a.m. on January 18, 2017, Sheinfeld logged into the brokerage account that held his Rite Aid options, called the customer support number for the account, and then, during this recorded call, "Sheinfeld stated that he was looking to exercise all of his Rite Aid options—amounting to 124,550 Rite Aid shares—and sell those shares at a limit price of $8.60 per share (approximately four cents below the current market price at the time)."  (Id. ¶ 57.)  After being informed that an order of that size could "put negative pressure on the stock price and result in a lower price per share," Plaintiff alleges that Sheinfeld chose to have the trading desk work the trade "in the best way to complete it (regardless of price)" in order to "sell the shares quickly."  (Id. ¶ 58.)  The trading desk proceeded to execute the order, through which Sheinfeld "netted approximately $872,275."  (Id. ¶¶ 59-60.)  Similarly, Plaintiff alleges that, on January 19, 2017, at approximately 3:28 p.m., Sheinfeld logged into the brokerage account of a family member ("Family Member 1") and "placed a limit order to sell all 6,500 shares of Rite Aid in the account at a limit price of $8.59 per share.  The order was fully executed almost immediately, and 6,500 Rite Aid shares were sold from Family Member 1's

6

account . . . for a total of $55,841." (Id. ¶¶ 61-62.)  Finally, at approximately 3:35 p.m. the same day, Plaintiff alleges that Sheinfeld logged into the brokerage account of another family member ("Family Member 2") and "placed an order to sell all 7,200 shares of Rite Aid in the account at a limit price of $8.59 per share.  The order was fully executed almost immediately, and 7,200 Rite Aid shares were sold from Family Member 2's account . . . for a total of $61,851." (Id. ¶¶ 64-65.)

On January 20, 2017, at approximately 10:40 a.m., Bloomberg published an article reporting that FTC officials were concerned that Walgreens' and Rite Aid's efforts to preserve competition were not sufficient and noting that the FTC likely would not be approving the merger by January 27, 2017.  (Id. ¶ 67.)  Plaintiff alleges that after the Bloomberg article was published, "Rite Aid's stock price fell, closing on January 20, 2017 at $7.46 per share—approximately 13% lower than the prior day's closing price." (Id. ¶ 68.)  On January 30, 2017, Walgreens and Rite Aid officially announced an amended merger agreement, "extending the end date to July 31, 2017 and lowering the price that Walgreens would pay per share of Rite Aid from $9.00 to $6.50 to $7.00." (Id. ¶ 69.)  Plaintiff asserts that by liquidating the vast majority of his own holdings in Rite Aid in advance of the public disclosure of the failure to obtain FTC approval for the merger by the January deadline, "Sheinfeld avoided lossed of at least $140,000." (Id. ¶ 70.)  Similarly, Plaintiff alleges that Sheinfeld's actions "avoided losses for Family Member 1 and Family Member 2 of at least $7,000 and $8,000, respectively." (Id.)

## II.    LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When reviewing the sufficiency of a complaint pursuant to a motion to dismiss

under Rule 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  However, the Court need not accept legal conclusions set forth as factual allegations.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rather, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Consistent with the Supreme Court's ruling in Twombly and Ibqal, the Third Circuit has identified three steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6):  (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F. 3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).  A complaint is properly dismissed where the factual content in the complaint does not allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678.  Additionally, a court may not assume that a plaintiff can prove facts that the plaintiff has not alleged.  See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983).

## III.   DISCUSSION

### A.   Legal Standard

The Exchange Act provides that it is unlawful for anyone to use or employ and "manipulative or deceptive device" in connection with the purchase or sale of any security

registered on a national securities exchange. <u>See</u> 15 U.S.C. § 78j. The implementing regulation for this provision clarifies that it is unlawful to: (1) "employ any device, scheme, or artifice to defraud"; (2) "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (3) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security. <u>See</u> 17 C.F.R. § 240.10b-5. "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." <u>United States v. O'Hagan</u>, 521 U.S. 642, 651–52 (1997).

Information is material for purposes of a securities fraud analysis if it "would be important to a reasonable investor in making his or her investment decision." <u>See</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1425 (3d Cir. 1997). When information goes undisclosed, it may nonetheless be considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the total mix of information' available to that investor." <u>See</u> <u>Oran v. Stafford</u>, 226 F.3d 275, 282 (3d Cir. 2000) (citing <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d 696, 714 (3d Cir.1996)). "[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." <u>Id.</u>

For claims alleging fraud or mistake, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading obligation. <u>See</u> Fed. R. Civ. P. 9(b). Specifically, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

See id.  Imputing this standard to the scienter requirement for securities fraud claims, a plaintiff

must: "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2)

allege facts showing both a motive and a clear opportunity for committing the fraud."  See

Burlington, 114 F.3d at 1422.  Notably, however, although the pleading requirements of Rule

9(b) apply to claims of securities fraud, "the normally rigorous particularity rule has been relaxed

somewhat where the factual information is peculiarly within the defendant's knowledge or

control."  See id. at 1418.

### B.    Parties' Arguments

In support of the instant motion, Defendant raises several arguments.  Defendant argues

primarily that the information that he allegedly possessed and traded on was not material,

characterizing Plaintiff's allegations as "speculative" and "obvious."  (Doc. No. 13 at 6-7, 13-

14.)  In the alternative, Defendant argues that knowledge of FTC concerns with the merger was

materially different from the information that he allegedly possessed.  (Id. at 7-8.)  Finally,

Defendant argues that Plaintiff's complaint fails to plead facts with the particularity required by

Rule 9(b).  (Id. at 9-11.)

In response, Plaintiff disputes all of Defendant's assertions.  First, Plaintiff argues that

materiality is a factual matter that cannot be decided on a motion to dismiss except in limited

circumstances.  (Doc. No. 17 at 12-13.)  In the alternative, Plaintiff asserts that it has pleaded

facts sufficient to allow the Court to draw the inference that the information Defendant allegedly

possessed and traded on was material; specifically, that the complaint "alleges numerous facts

supporting the strong inference that Defendant traded while in possession of material nonpublic

information, including Defendant's access to information about the Planned Merger through his

position and role at Rite Aid and Defendant's sudden decision to liquidate his and his family's

Rite Aid holdings." (Id. at 13.) Further, Plaintiff argues that it has satisfied the requirements of Rule 9(b). (Id. at 11, 19-20.)

### C.    Whether the Court Should Dismiss Plaintiff's Complaint

Upon review of Plaintiff's complaint, the parties' arguments, and the applicable law, the Court will deny Defendant's motion to dismiss Plaintiff's complaint. As an initial matter, the Court agrees with Defendant that materiality can be determined when reviewing a motion to dismiss. See, e.g., Oran, 226 F.3d at 282-86 (reviewing and affirming a district court's finding of immateriality on a motion to dismiss). However, the Court determines that Plaintiff has adequately alleged that the nonpublic information Defendant acted on—the emails indicating the merger would not close by the deadline and the implications thereof—was material.

As noted, supra, in assessing materiality, courts within the Third Circuit consider whether the information "would be important to a reasonable investor in making his or her investment decision." See Burlington, 114 F.3d at 1425. To make such a determination, the Court may reasonably look "to the movement in the price of [] stock following disclosure . . . ." See Oran, 226 F.3d at 283. Upon review of Plaintiff's complaint, which specifically alleges that only a few days after Defendant received emails disclosing that the merger was unlikely to close by the deadline Bloomberg published an article that the merger would not close that resulted in Rite Aid's stock falling by thirteen (13) percent, the Court finds that Plaintiff has sufficiently alleged facts supporting a strong inference that Defendant possessed and traded on material nonpublic information.

Defendant's argument in support of dismissal rests on the existence of a distinction between the information contained in the emails and the information reported in the Bloomberg article. Defendant argues that while the information reported in Bloomberg affected Rite Aid's

stock price, Defendant did not have access to that same information when he sold his stocks.
The Court finds this argument unavailing.  Here, Plaintiff has clearly alleged, and Defendant
does not dispute, that he received emails stating that the merger would likely occur by the
January 27 deadline.  (Doc. No. 1 ¶¶ 52-53.)  The Court agrees with Plaintiff that Defendant, a
high-level employee at Rite Aid, would have understood "what the [delay discussed in the]
emails implied—i.e., that the FTC was unlikely to approve the Planned Merger by the deadline."
(Doc. No. 17 at 18.)   In fact, Defendant's conduct upon receiving the information—selling not
only his own shares but those owned by family members—also suggests that he understood the
emails to mean the merger would not go through and that the failure to meet the deadline would
impact the value of his and his family members' stock holdings.  Accordingly, the Court finds
that it is reasonable to infer from the circumstances alleged that Defendant had knowledge that
the deal would not go through, understood the material implications of that nonpublic
information, and proceeded to act accordingly to sell his shares.  See, e.g., SEC v. McGee, 895 F.
Supp. 2d 669, 683-84 (E.D. Pa. 2012) (denying motion to dismiss complaint that relied on
allegations of circumstantial evidence).

Next, the Court addresses Defendant's argument that Plaintiff has nonetheless failed to
meet the heightened pleading standard required by Federal Rule of Civil Procedure 9(b) for
claims of this type.  In the present case, Plaintiff clearly pleads with particularity the
circumstances constituting the fraud alleged.  See Fed. R. Civ. P. 9(b).  Plaintiff's complaint
extensively details the merger at issue, Defendant's role at Rite Aid in preparing for the merger,
and his access to both high-level executives and confidential, nonpublic information related to
both companies and the merger.  The complaint further details how Defendant came into
possession of the material nonpublic information at issue, gives context, and provides a

compelling timeline of the events leading up to his alleged insider trading, as well as providing specifics regarding his alleged insider trading.  With respect to scienter, the Court finds that Plaintiff's complaint both plausibly establishes motive and opportunity for Defendant by detailing the knowledge he had access to in the context of the larger merger and plausibly alleges that Defendant's conduct was conscious or reckless—as a high-level Rite Aid employee, Defendant knew trading based on confidential information was prohibited, but he nonetheless allegedly sold stocks after learning the merger was unlikely to close.  See Herman & MacLean v. Huddleston, 459 U.S. 375, 390–91 n. 30 (1983) (acknowledging that "circumstantial evidence can be more than sufficient" to demonstrate scienter in securities fraud cases); Burlington, 113 F.3d at 1422 (noting that a plaintiff must "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud").  Accordingly, the Court finds that Plaintiff has met its pleading burden at this stage and will deny Defendant's motion to dismiss.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Doc. No. 12) will be denied. An Order consistent with this Memorandum follows.